[No. D015011. Fourth Dist., Div. One. Dec. 14, 1992.]

RACINE & LARAMIE, LTD., INC., Plaintiff and Respondent, v. DEPARTMENT OF PARKS AND RECREATION, Defendant and Appellant.

## Counsel

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Acting Assistant Attorney General, Douglas B. Noble and James E. Ryan, Deputy Attorneys General, for Defendant and Appellant.

Jack H. Kaufman for Plaintiff and Respondent.

## Opinion

**FROEHLICH, J.**—Racine & Laramie, Ltd., Inc. (Racine) is a concessionaire occupying and operating premises in Old Town San Diego State Historic Park under a contract, which bears many attributes of a long-term lease, with the California Department of Parks and Recreation (Department). The contract was executed in 1974 for a term of 40 years, thus extending until the year 2014. Over a period of several years in the 1980's Racine negotiated with the Department for modifications in the concession contract which would permit expanded operations of the premises. Originally limited to the operation of a tobacco shop and wine tasting facility, the negotiations contemplated operation of a restaurant and the on-premises sale of alcoholic beverages.

When negotiations broke down in 1988, Racine brought suit against the Department. Of the several initial causes of action, only one survived demurrers: a cause of action denominated "Breach of Implied Covenant of Good Faith and Fair Dealing." Tried to a jury, the case was submitted on special verdicts. The jury found that the Department was guilty of "breach [of] the covenant of good faith and fair dealing in its negotiations of an amendment/new contract to the concession agreement with the plaintiff" and that as a result of such breach Racine had been damaged in the sum of $592,110.

Department appeals the judgment on two grounds: (1) there can be no breach of the covenant of good faith by a refusal to enter into a new contract,

and (2) the damage award is speculative and excessive. Since we rule in favor of Department as to its first contention, we do not reach the damage issue.

### CONTROLLING FACTS

A very detailed examination of the parties' relationship and negotiations was presented to the jury. Since we are bound to accept the jury's determination of fact, assuming it to be supported by substantial evidence, we have no need of close focus on the history of the case. We therefore review the factual background summarily. Modification of a concession contract such as that here involved requires action by several state entities. The concessionaire deals with employees of the Department: Racine commenced doing this as early as 1980. Any contract which would permit on-premises sale of alcoholic beverages must, however, receive approval by the State Park and Recreation Commission (Commission) (Pub. Resources Code, § 5080.20), which is an entity vested with power to establish general policies to guide the Department. (Pub. Resources Code, §§ 530, 539.)

An "impact study" was presented by the Department to the Commission in 1983 which reflected Racine's efforts to establish a restaurant and on-premises liquor sales. On March 31, 1983, the Commission passed a resolution authorizing the Department to permit the expansion of Racine's concession, provided the concession contract be amended to conform to other contracts which had been negotiated with other Old Town concessionaires and include "such other terms as may be required."[1]

Public Resources Code section 5080.20 requires that concession contracts involving certain floor figures of either investment or estimated gross sales, as included in this proposed contract modification, be submitted for review by the Legislature. On July 19, 1983, the Legislature authorized the renegotiation of the existing contract, directing that the Department "attempt to renegotiate the existing rent for the sale of pipes and tobacco products." Although Racine leans heavily on the actions of the Commission and the Legislature as somehow enhancing subsequent relations between Racine and

---

[1] The full text of the resolution was as follows: "Now, THEREFORE, BE IT RESOLVED that the Director of Parks and Recreation *may* include in the concession agreement for the operation of the Racine & Laramie, Ltd., tobacco and pipe shop and wine tasting room at the Casa de Juan Rodriguez in Old Town San Diego State Historic Park, provisions for the sale of distilled spirits *provided the present concession contract terms are amended to conform to those recently negotiated with the other concessionaires in Old Town San Diego State Historic Park, and such other terms as may be required.*" (Italics in original.)

the Department to a higher status than mere negotiations, it is clear that neither action binds the Department in any way.[2]

The parties thereafter met at various times from 1983 through August 1985 and circulated various drafts of proposed amendments to the concession contract, but achieved no final agreement. After a hiatus of some 32 months, the parties renewed negotiations, resulting in a new written proposal from Racine, dated June 9, 1988. This proposal was quite different from that contained in the 1983 draft. For instance, instead of a 45- to 70-seat restaurant a 300-seat restaurant was proposed. Also, Racine sought to close the tobacco store operation completely. The Department replied by letter dated August 3, 1988, rejecting the proposal on several grounds. One ground, for instance, was that the Department felt the members of the then constituted Commission would probably not accept full alcoholic sale privileges. Another illustrative difference of approach was that the Department now favored only a "quick food" operation, as opposed to a full-service restaurant.

The instant lawsuit was then filed by Racine, without further negotiations. No negotiations have since taken place, although the Department in subsequent correspondence professed willingness to reopen the negotiations.

 Racine's position is that having embarked upon lengthy negotiations over a period of several years, which negotiations resulted in tentative agreement as to some of the prospective changes in the concession contract, the Department was precluded arbitrarily and unilaterally from retreating from such positions. Racine emphasizes the fact that it was in an existing contractual relationship with the Department, and that this relationship explicitly contemplated future negotiations for contract modification. Paragraph 25 of the concession contract provided:

"Notwithstanding any of the provisions of this contract, the parties may hereafter, by mutual consent, agree to modifications thereof or additions

[2]The Commission's policy in this regard, contained in the preamble of its statement of policy (adopted in accordance with Pub. Resources Code, § 539) includes the following language: "Besides the creation of general policy statements for the guidance of the Director (which the Director must follow), the Commission will make recommendations to the Director based upon the results of committee study and/or statements made by individuals appearing at Commission meetings. Since these recommendations are based upon the public hearing aspect of the Commission's meetings, they are entitled to much consideration by the Department. But they do not occupy the same position as policy statements. And the Director may, for good reason, make decisions contrary to such recommendations." Also, of course, the literal wording of the approvals given by both the Commission and the Legislature indicates no more than consent to proceed with negotiations.

thereto in writing which are not forbidden by law. The State shall have the right to grant reasonable extensions of time to Concessionaire for any purpose or for the performance of any obligation of Concessionaire hereunder."

Once having entered into negotiations for a change in the contract, in accordance with paragraph 25 thereof, Racine takes the position that the bargaining had to be conducted in good faith. The Department's alleged reversal of its position on such matters as the full liquor sales privilege and the full restaurant service is characterized by Racine as arbitrary and capricious, and a violation of the covenant of good faith and fair dealing contained by implication in the concession contract.

We do not know exactly what it was in the facts of the case which led the jury to conclude, in its special verdict, that the Department had exhibited bad faith in its negotiations. We do know, however, that the jury was instructed generally on the law of the implied covenant of good faith and fair dealing, deemed to exist in every contract. We also know that counsel for Racine in argument contended that the sudden and arguably arbitrary reversal of negotiating stance taken by the Department constituted a violation of the covenant. We must assume that the jury so found.

We reverse because we conclude that the Department had no obligation to negotiate new terms of the concession contract, that its commencement and continuance of negotiations over a long period of time had no effect upon this lack of obligation, and that its assumption of an arbitrary stance at some point in the negotiations cannot therefore be a breach of any contract term, including implied contract terms of good faith and fair dealing, even though such conduct might be found by a jury to be unreasonable, unfair, or otherwise bad faith negotiation tactics.

Our conclusion in this regard is based, we believe, on rather simple and unassailable contract law principles. ■ The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684, 689-690 [254 Cal.Rptr. 211 [765 P.2d 373].) "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." (*Id.* at p. 690.) As we stated in *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136 at page 1153 [271 Cal.Rptr. 246]: "In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in

conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."

 There existed no express contractual obligation here to negotiate a modification of the concession contract. The provision closest to a possible obligation is that contained in paragraph 25 of the contract, which falls far short of the imposition of any obligation on either party to even participate in activity leading to a modification of the concession. Similarly, the actions taken by the Commission and by the Legislature imposed upon the Department no obligation to enter into either contract negotiations or a contract amendment, but simply removed statutory conditions precedent to the Department's doing so if it should so elect.

There is no obligation to deal fairly or in good faith absent an existing contract. (*Hess* v. *Transamerica Occidental Life Ins. Co.* (1987) 190 Cal.App.3d 941 [235 Cal.Rptr. 715]; *Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555 [260 Cal.Rptr. 237].) If there exists a contractual relationship between the parties, as was the case here, the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract. (*Gibson* v. *Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441, 448 [208 Cal.Rptr. 511].)

Racine attempts to avoid these accepted principles of law by asserting that, either in general or as related to this specific case, once a negotiation has been undertaken there is an obligation implied in law to negotiate in good faith. Racine relies heavily on a scholarly analysis of this concept set forth in Kessler and Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study* (1964) 77 Harv.L.Rev. 401 (Kessler & Fine). This article reviewed and expanded upon a thesis first propounded in German legal philosophy in 1861, characterized by Kessler & Fine as "the thesis that damages should be recoverable against the party whose blameworthy conduct during negotiations for a contract brought about its invalidity or prevented its perfection." (*Ibid.*)

The difficulty with Racine's reliance on this thesis is that it has never been accepted in Anglo-American jurisprudence. Indeed, the authors' summation of the concept flatly states that "The common law appears to have no counterpart to the German doctrine of *culpa in contrahendo*."[3] Racine contends that the doctrine *has* been accepted by American jurisprudence, citing

_____

[3]Even were we to find that, somehow, this doctrine either existed or should be declared to exist in the common law, it would not support Racine's claim in this case. The *culpa in*

principally *Channel Home Centers, Grace Retail v. Grossman* (3d Cir. 1986) 795 F.2d 291. This reliance is, however, misplaced. *Channel* was a case in which negotiations for a lease led to the execution of a "letter of intent." Adhering to the law we have previously referenced, the *Channel* court first stated that "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." (*Id.* at p. 298.) The court went on, however, to find that the terms of the letter of intent constituted an agreement to negotiate in good faith. "[S]uch an agreement, if otherwise meeting the requisites of a contract, is an enforceable contract." (*Id.* at p. 299.) Citing and quoting from *Thompson v. Liquichimica of America, Inc.* (E.D.N.Y. 1979) 481 F.Supp. 365, 366, the court explained that " 'Unlike an agreement to agree, which does not constitute a closed proposition, an agreement to use best efforts [or to negotiate in good faith] is a closed proposition, discrete and actionable.' " (*Channel, supra,* at p. 299.) The court then found, as a matter of fact, that the letter of intent before it *was* an agreement to negotiate in good faith, and hence a failure to do so was actionable. The case does not stand for the proposition that failure to bargain in good faith is actionable *absent* an agreement imposing such obligation.[4]

---

*contrahendo* concept is one of repairing the damage done by bad faith negotiations, rather than awarding the damaged party the benefits or profits he would have gained had the negotiations succeeded. (Kessler & Fine, *supra,* at p. 405.) The evidence in this case disclosed no particular or specific damage incurred by Racine as a result of the flawed negotiations (such as having commenced work on the new restaurant, spent money for a liquor license, or the like). The damage testimony which resulted in the very large verdict reflected estimates of lost profits Racine would have made over the balance of the 40-year lease had the negotiations succeeded—upon the terms Racine sought, of course.

[4]We find that other cases cited by Racine as standing for the proposition of an existence of an implied duty of good faith bargaining also rest upon a finding by the court of the existence of an *express* commitment to enter into negotiations, or are otherwise unsupportive of Racine's position. These are: *Phoenix Mut. Life Ins. v. Shady Grove Plaza Ltd.* (D.Md. 1990) 734 F.Supp. 1181 (negotiations to achieve capital contribution to a building project failed, giving rise to a claim of failure to negotiate in good faith; any duty to bargain in good faith would be created by the letter of intent, and the letter of intent in this case created nothing preventing a party from "refusing to budge" or from "bargaining to its own economic advantage." (*Id.* at p. 1190)); *A/S Apothekernes Laboratorium v. I.M.C. Chemical* (7th Cir. 1989) 873 F.2d 155 (the letter of intent in this case was found to constitute an agreement to bargain in good faith, but the appellate court found that agreement had been fulfilled: "The full extent of a party's duty to negotiate in good faith can only be determined . . . from the terms of the letter of intent itself." (*Id.* at p. 158)); *Thompson v. Liquichimica of America, Inc., supra,* 481 F.Supp. 365 (simply held that an agreement to use "best efforts" to conclude an agreement is itself a contract which can be enforced); *Reprosystem, B.V. v. SCM Corp.* (2d Cir. 1984) 727 F.2d 257 (although parties can agree to bargain in good faith to reach a contract, no such agreement was found in this case); *Itek Corporation v. Chicago Aerial Industries, Inc.* (Del. 1968) 248 A.2d 625 (a detailed letter of intent itself was found to be intended as a final contract, hence enforceable). In short, all these cases stand for the proposition that the

Racine also cites as supportive of its position Justice Traynor's opinion in *Drennan* v. *Star Paving Co.* (1958) 51 Cal.2d 409 [333 P.2d 757]. *Drennan* was a case of revocation of a construction bid before acceptance of the bid, but after the owner of the project had altered its position in reliance upon the bid. Finding no contract, but holding the bid nevertheless enforceable, the opinion relies upon traditional concepts of promissory estoppel. Promissory estoppel is described as: " 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " (*Id.* at p. 413, quoting Rest., Contracts, § 90.)

Racine's claim was neither pleaded nor tried as promissory estoppel; moreover, the facts do not fit such theory. At no time was any promise made by the Department, and nothing the Department did resulted (insofar as the evidence adduced at trial indicated) in any action or forbearance of action on the part of Racine.

Finally, Racine attempts to find support for its position in the line of cases dealing with discretionary powers vested in one party to a contract to take action which affects the interests of the other party. ■ Such discretionary powers must be exercised in good faith; in other words, when discretionary powers are vested in one party, an implied term of the contract provides that such powers will not be exercised arbitrarily or in disregard of the purposes of the contract and the interests of the other party. (See, e.g., *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785 [49 A.L.R.2d 496]; *Mission Ins. Group, Inc.* v. *Merco Construction Engineers, Inc.* (1983) 147 Cal.App.3d 1059 [195 Cal.Rptr. 781].) These cases are inapposite to our situation. With respect to its concessionaire, at least in terms of modification of the concession contract, the Department had no discretionary powers which could be exercised unilaterally.

■ To recapitulate: The fact that parties commence negotiations looking to a contract, or to the amendment of an existing contract, does not by itself impose any duty on either party not to be unreasonable or not to break off negotiations, for any reason or for no reason. During the course of

---

commencement of negotiation activities looking to the final achievement of a contractual agreement imposes no obligation of good faith or fair dealing *unless* there is an underlying agreement of some sort (letter of intent, preliminary agreement to use best efforts to agree, etc.) which provides the contractual commitment to use best efforts.

negotiations things may be done which *do* then impose a duty of continued bargaining only in good faith.[5]

For instance, a preexisting agreement may impose an obligation of good faith bargaining with respect to the modification of some term of the agreement. The preexisting agreement which vests a discretionary power of alteration of the terms of the agreement may impliedly require that such be done in good faith. Or, in anticipation of an agreement the parties may, by letter of intent or otherwise, agree that they will bargain in good faith for the purpose of reaching an agreement. Finally, in the course of negotiations it is possible for a party to so mislead another by promises or representations, upon which the second party detrimentally relies, as to bring into play the concept of promissory estoppel.

Absent the existence of such special circumstances or conditions, however, there is no obligation in California to bargain for a new or amended contract in good faith. None of the enumerated special circumstances existed in this case. The fact that bargaining took place over a period of many years and that the parties reached tentative agreement from time to time on some of the points at issue does not detract from this conclusion. There was in this case simply no contractual basis upon which to extract implied conditions of good faith bargaining.

## DISPOSITION

The judgment in favor of plaintiff is reversed, and the trial court is directed to enter judgment notwithstanding the verdict in favor of the Department. Defendant is entitled to costs on appeal.

Wiener, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied January 6, 1993, and respondent's petition for review by the Supreme Court was denied March 25, 1993.

---

[5]Of course, obligations of good faith bargaining may arise not by contractual agreement of the parties but by statutory imposition. (See, e.g., Lab. Code, § 1153, subd. (e), which imposes an obligation to conduct labor negotiations in good faith.) No such statutory obligation is presented in this case.