**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DUAL, INCORPORATED,
Plaintiff-Appellant,

v.                                                          No. 97-1228

SYMVIONICS, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CA-96-1084-A)

Argued: July 15, 1997

Decided: September 12, 1997

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by unpublished opinion. Senior Judge Phillips wrote the
opinion, in which Judge Murnaghan and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Raymond Donald Battocchi, GABELER, BATTOCCHI
& GRIGGS, L.L.C., McLean, Virginia, for Appellant. Michael Joseph
Klisch, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P.,
McLean, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Dual Incorporated (Dual) sued Symvionics, Inc. (Symvionics), alleging fraud and breach of contract arising out of unsuccessful efforts to negotiate for Dual a subcontract under Symvionics's prime contract to build a flight simulator. The district court granted summary judgment in favor of Symvionics on all counts. Finding no error, we affirm.

I

In the fall of 1994, the United States Air Force (USAF) solicited bids to produce a flight simulator for its A-10 attack aircraft. Symvionics decided to pursue the bid, discussed the proposed costs with USAF, and sought a subcontractor for the cockpit portion of the simulator. After discussing the price constraints with two other potential subcontractors, Symvionics initially chose Dual to be the proposed subcontractor for its simulator bid, largely because Dual agreed to limit its costs for the project to USAF's expectations.

On November 2, 1994, Symvionics and Dual entered into a Teaming Agreement (Agreement). The Agreement provided that Dual would submit a proposal to Symvionics for the simulator cockpit and that Symvionics would then submit its proposal to USAF using Dual as its subcontractor. The Agreement required Symvionics to "exert its best efforts to the extent practical to produce the proposal . . . which will cause . . . the acceptance of Dual as the Subcontractor." The Agreement also provided,

> In the event [Symvionics] is awarded the Contract for this program, [Symvionics] and [Dual] agree to negotiate in good faith and proceed in a timely manner to conclude a mutually acceptable subcontract for supply of the aforesaid

2

data and support which is to be provided by [Dual], as
described in [Dual's] technical/cost proposal for this effort.

In January 1995, Dual submitted a written cost proposal to Symvionics for its portion of the bid, and Symvionics included Dual's analysis as part of its bid to USAF in February. Dual's proposed costs had increased substantially between October 1994 and January 1995, and USAF informed Symvionics that Dual's proposed costs were excessive. Symvionics then conducted a "should cost analysis," consisting of an independent check of Dual's costs and an exploration of the industry to determine whether Dual's proposed costs were unusual. USAF suggested that Symvionics submit another proposal using figures from another cockpit subcontractor, and in March 1995 Symvionics submitted a bid using figures for the cockpit subcontract from Flight Safety International. Symvionics did not, however, withdraw its February bid using Dual as its subcontractor.

In August 1995, in response to USAF's continuing concern about its costs, Dual agreed to reduce its costs to a "firm fixed price" of $1,322,722 for the first simulator cockpit and a corresponding smaller amount for subsequent units. That month, based in part on Dual's agreement, USAF awarded the prime contract to Symvionics based on the February 1995 bid that included Dual as the subcontractor.

Dual then asked Symvionics for a preliminary order to allow Dual to begin its work. Symvionics responded with a long, detailed purchase order. Believing the complexity of the order to be premature, Dual requested a simpler document and drafted a "Letter Subcontract." After some negotiation and minimal changes offered by Symvionics, the parties signed the Letter Subcontract allowing Dual to begin work on the project but limiting it from "incur[ring] obligations exceeding $100,000." The Letter Subcontract specifically contemplated that Dual would meet the $1,322,722 "not to exceed" figure for the first cockpit. Dual began its work on the project, and at Dual's request, Symvionics extended Dual's cost ceiling under the Letter Subcontract to $450,000.

Meanwhile, Symvionics and Dual began negotiating the subcontract. In November 1995 the parties prepared a "Systems Requirement Review" for USAF, and soon thereafter Symvionics submitted a first

3

draft of the subcontract to Dual. Dual did not respond to this draft until February 1996, but neither Fred Dual, the owner of Dual, nor Joe Calandrino, Dual's primary negotiator, could identify any evidence of bad faith on the part of Symvionics during these preliminary negotiations. Dual and Symvionics disagreed substantially as to the technical requirements of the subcontract, and their negotiators spent March and April ironing out these disputes. By April 30 all of these disputes had been resolved.

In early May 1996, Dual informed Symvionics that its costs for the first unit had increased significantly, in a range between $200,000 and $400,000 over the "not to exceed" price, due to revised estimates from Dual's vendors. Symvionics had already agreed to increase this amount by $50,000, to $1,372,722, due to delays in furnishing Dual with certain technical information. When Calandrino informed Lawrence Barraza, Symvionics's chief executive, of the new price increases, Barraza became concerned that Symvionics might lose the simulator contract because of the difficulties in completing the subcontract. Barraza pointed to USAF's Preliminary Design Review (PDR), scheduled for June 3-5, and advised Dual that failure to execute the subcontract by that date could jeopardize the project.

On May 17, Dual concluded that its costs would run to approximately $1,750,000, and on May 21 Symvionics declared this to be unacceptably high. The parties continued to negotiate, however, and on May 24, Dual informed Symvionics that it could build the cockpit for $1,500,000. Later that day, Symvionics made a counteroffer of $1,422,722, an amount $50,000 greater than the highest amount to which the parties had previously agreed. Symvionics's counteroffer also included a proposed waiver of any claims by Dual for program delays through May 24. On May 28, Dual responded by accepting Symvionics's offer except for the proposal to waive their claims, and asked Symvionics to accept or reject that offer by the next day.

Symvionics asked Dual to stop its work on the subcontract on May 28, but expressly did not terminate the negotiations. From May 28 until June 3, the date of the PDR, however, Barraza could not contact any of the Dual officials responsible for the contract. On June 3, Barraza decided to reject Dual's counteroffer and terminate negotiations with Dual. That same day, Dual tried to inform Symvionics that it

4

would accept all of the terms of Symvionics's May 24 offer without reservation, but Symvionics refused to accept this capitulation. Barraza testified in deposition that he decided to discontinue the negotiations after learning from a USAF official that Dual had gone to USAF to offer its services on the project regardless of Symvionics's involvement. Barraza testified that he regarded this communication as inappropriate and it cemented his decision to terminate the negotiations. Symvionics ultimately subcontracted with Armstrong Laboratories, an arm of USAF, to build the cockpits.

Dual filed suit in the Circuit Court for Arlington County, Virginia, alleging fraud and breach of contract. Symvionics removed the case on diversity of citizenship grounds to the United States District Court for the Eastern District of Virginia. After discovery, Symvionics moved for summary judgment under Fed. R. Civ. P. 56(e), alleging there were no genuine issues of material fact and that it was entitled to judgment on all claims as a matter of law. The district court determined that Symvionics had not acted fraudulently in inducing Dual to enter into the Teaming Agreement, and that Symvionics had not breached any of the terms of that Agreement, and therefore granted Symvionics's motion. This appeal followed.

II

We review a district court's grant of summary judgment de novo. See Kimsey v. City of Myrtle Beach, S.C., 109 F.3d 194, 195 (4th Cir. 1997). In order to prevail, the moving party must establish that its opponent cannot "make a showing sufficient to establish the existence of an element essential to that party's case," and that he or she therefore is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the non-moving party has the burden of proof at trial, Fed. R. Civ. P. 56(e) requires him or her to "go beyond the pleadings" to designate specific facts demonstrating a genuine issue of material fact for trial. Id. at 324. We view the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Kimsey, 109 F.3d at 195.

After some initial confusion, the parties have agreed that California law governs this case. Dual claims first that Symvionics fraudulently

5

induced it to enter into the Teaming Agreement, in that at the time the Agreement was executed, in November 1994, Symvionics had no intention of honoring its terms. Dual produced no direct evidence to support its claim, however, pointing only to the fact that Symvionics did not accept Dual's final offer in June 1996. As Dual acknowledges, the Teaming Agreement did not require Symvionics ultimately to enter into the subcontract with Dual, but only to negotiate in good faith to arrive at such a subcontract. Despite Dual's arguments, nothing in Symvionics's actions until June 1996 even arguably serves as circumstantial evidence to support a claim of fraud. Rather, Symvionics acted in a manner fully consistent with the teaming agreement: It submitted a proposal to USAF including Dual as a subcontractor, then allowed Dual to begin work while spending many months trying to negotiate the final subcontract. Dual points to Symvionics's consultation with Flight Safety International in its second proposal to USAF, but Symvionics did not at that time withdraw its bid naming Dual, and ultimately USAF accepted Symvionics's bid using Dual as the subcontractor. Fred Dual and other Dual representatives also concede that Symvionics was acting in good faith when they began the subcontract negotiations late in 1995, acknowledging in effect that at that time Symvionics intended to complete the subcontract. In short, Dual presents nothing to create a question of material fact as to any fraud on the part of Symvionics.

Dual also contends that Symvionics violated the Teaming Agreement in two different ways. First, Dual argues that the Agreement obligated Symvionics to secure USAF approval of Dual as a subcontractor, an obligation which would have limited Symvionics's ability not to choose Dual as the subcontractor. The only evidence presented by Dual to support this critical contention, however, is found in Fred Dual's assertion to that effect in deposition and it is unsupported by any official rule or regulation to that effect. In fact, USAF contracting agents testified in deposition that USAF does not restrict prime contractors in any way in choosing their subcontractors, and therefore any USAF "approval" would have been entirely ineffective. Consequently this argument cannot support any claim for damages for its breach, and summary judgment was appropriate.

Finally, Dual claims that Symvionics breached the Teaming Agreement in failing to negotiate in good faith to complete the subcontract. Symvionics argued before the district court and here that the Teaming

Agreement terminated by its terms in November 1995, and that the Teaming Agreement's good faith provision was an unenforceable "agreement to agree." We agree with the district court that under California law, as stated in Racine & Laramie, Ltd., Inc. v. California Dep't of Parks and Recreation, 11 Cal. App. 4th 1026, 1032 (Cal. Ct. App. 1992), parties may contract to create the obligation to negotiate in good faith with one another, so long as the obligation does not go so far as to require an agreement on a subsequent contract. See also Thompson v. Liquichimica of America, Inc., 481 F. Supp. 365, 366 (S.D.N.Y. 1979). Though Dual appears to acknowledge that the Teaming Agreement expired by its terms in November 1995, Fred Dual testified that Barraza verbally agreed to extend the Agreement until the subcontract was signed.

Without considering that possibility, we conclude that Dual has not created a genuine issue of material fact as to Symvionics's good faith. Dual acknowledges that Symvionics initiated the negotiations in good faith, and authorized $450,000 of work for Dual to begin the project. Even as Dual's proposed costs rose, Symvionics made efforts to accommodate them. Then, after months of negotiation and agreeing on virtually every issue, Symvionics made an offer on May 24 that, if timely accepted, would have bound Symvionics to subcontract with Dual. Dual does not attempt to argue that the terms of that offer were extravagant or frivolous; in fact Dual tried to accept that offer several days later. Rather, the contention is based entirely on the fact that Symvionics decided to terminate negotiations just before Dual announced its intention to accept Symvionics's offer. Symvionics has presented several reasons for terminating the negotiations at that time, notably the imminent PDR and Dual's independent communication to USAF, that are fully consistent with its previous efforts to negotiate in good faith. Dual has not presented evidence to support the crucial allegation that Symvionics acted in bad faith in spurning Dual, and not just in its best interests as a government contractor. Summary judgment was therefore appropriate.

III

In sum, we agree with the district court that Dual failed to create a genuine issue of material fact as to any of its claims. Accordingly we affirm the district court's grant of summary judgment.

AFFIRMED

7