Filed 3/6/13  Portman v. New Line Cinema CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NEIL PORTMAN et al., | B233669 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC417739) |
| NEW LINE CINEMA CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard E. Rico, Judge.  Affirmed.

Neil Portman, in pro. per.; Law Offices of Ronald M. Lebow and Ronald M. Lebow for Plaintiffs and Appellants.

Kelley Drye & Warren, Michael J. O'Connor, Edward E. Weiman, and Hajir Ardebili for Defendant and Respondent.

Neil Portman, an individual, and Portman & Company (collectively "Portman") appeal from a final judgment entered in favor of New Line Cinema Corporation (New Line) after the trial court sustained, without leave to amend, New Line's demurrer to Portman's second amended complaint. We affirm the judgment.

## BACKGROUND

### 1. The original complaint

The original complaint (OC) in this action was filed on July 13, 2009, and alleged causes of action against New Line for breach of contract, misappropriation of trade secrets, fraud and deceit, fraudulent concealment, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.

Portman alleged that he is a "developer of multi-media content through his development company, Portman & Company." He further alleged that in or about June 2002, he was introduced to officers of New Line through "an intermediary, Peter Kirshenbaum."[1] On June 3, 2002, Portman entered a signed written agreement with Kirshenbaum "related to the exploitation of Portman's motion picture project on party crashing." The agreement between Portman and Kirshenbaum detailed the terms under which Kirshenbaum would introduce Portman to senior management at New Line. The Portman-Kirshenbaum agreement was faxed to New Line, and individuals at New Line initialed the contract and returned it to Portman via fax.

Portman alleged that he disclosed to New Line that he was in "active conversations with United Talent Agency [(UTA)] regarding the development of [Portman's] party crashing comedy project."

On or around July 3, 2002, Portman personally delivered to New Line a copy of Portman's party crashing submission package which consisted of: (1) a detailed submission letter; (2) a book entitled "The Party Crasher's Handbook"; and (3) a copy of the business arrangement Portman signed with the author of the Party Crasher's

---

[1]      Kirshenbaum's name was spelled differently in the second amended complaint as "Kershenbaum."

2

Handbook, which granted Portman exclusive rights to develop a feature motion picture comedy based on the book and to present the project to studios. In the text of Portman's submission letter, Portman again disclosed that he was engaged in active dialogue with UTA regarding leading comedic talent for his project.

On or around July 10, 2002, New Line sent a letter to Portman in response to the July 3, 2002 party crashing submission letter. New Line acknowledged Portman's submission but stated that a comedy about party crashing was not something that New Line could get involved with at the time. Portman faxed to UTA a copy of his submission to New Line and the response letter that he received from New Line.

Portman alleged that Portman, New Line, and UTA subsequently engaged in an "ongoing and protracted dialogue" related to "talent attachments and the production of [Portman's] party crashing comedy motion picture." After six months of such discussions, Portman was informed by UTA that Portman's original choice of leading comedic actors opted not to participate in the project. Subsequent to this event, Portman alleged, New Line and UTA simultaneously stopped taking Portman's telephone calls and refused Portman access to relevant information regarding Portman's party crashing motion picture.

On or about July 15, 2005, New Line released a feature motion picture comedy entitled "Wedding Crashers," with an entire talent package provided by UTA. Portman alleged that the primary story line in the motion picture comedy was about party crashing.

Portman also discovered that on or about July 15, 2005, New Line made false and misleading statements in a declaration filed in superior court denying the allegations described above.

Portman alleged, on information and belief, that as of January 1, 2006, the motion picture Wedding Crashers grossed $210 million in the domestic United States marketplace; $78 million in the foreign marketplace; and a projected $235 million in DVD revenue. Portman alleged that he did not receive any compensation for presenting the party crashing project, along with UTA leading comedic talent, to New Line.

3

On October 16, 2009, New Line demurred to all six causes of action. New Line argued that the causes of action were barred by the doctrines of res judicata and collateral estoppel; that they were barred by the applicable statutes of limitation; and that they failed to state causes of action. In its memorandum of points and authorities, New Line pointed out that Rex Reginald (Reginald), whom New Line described as Portman's "producing partner," brought claims against New Line in August 2004 alleging that Wedding Crashers was based on a concept conceived by Reginald and pitched to New Line through Portman. Reginald's lawsuit (the Reginald action) was dismissed on the ground that Wedding Crashers was not substantially similar to Reginald's concept. New Line sought judicial notice of the complaint in the Reginald action, along with deposition excerpts taken from a deposition of Portman in that action, and filings related to New Line's successful summary judgment motion.

On February 8, 2010, the trial court sustained New Line's demurrer with 30 days to amend as to all causes of action on the ground that they appeared time-barred as a matter of law, and Portman's delayed discovery allegations were inadequate. The demurrer to the first cause of action for breach of contract, and the sixth cause of action for breach of the covenant of good faith and fair dealing, were also sustained on the ground that it could not be ascertained whether the alleged contract was written, oral or implied and that the material terms of the contract were not pled. Finally, the demurrer to the second cause of action for misappropriation of trade secrets was also sustained on the ground that Portman failed to allege facts showing a protectable trade secret.

In ruling on the demurrer, the court took judicial notice of the court's order in the Reginald action granting summary judgment, the appellate opinion affirming the order, and the existence and nature of the operative pleading. The court declined to take judicial notice of the other documents submitted by New Line.

## 2. The first amended complaint

Portman's first amended complaint (FAC) was filed on March 10, 2010. The FAC contained five causes of action for breach of written contract, misappropriation of trade

secrets, fraud and deceit, unjust enrichment, and breach of implied covenant of good faith and fair dealing.

On April 14, 2010, New Line filed a demurrer to the FAC. On the same date, New Line filed a request for judicial notice, asking that the court take judicial notice of: (1) the complaint filed in the Reginald action; (2) the first amended complaint filed in the Reginald action; (3) the fact that Portman was deposed twice in the Reginald action; and (4) the fact that Portman submitted two declarations in the Reginald action.

On November 10, 2010, the trial court sustained New Line's demurrer to the first, second, third and fifth causes of action on the ground that the claims appeared time-barred as a matter of law, and Portman's attempted delayed discovery allegations were inadequate. The court stated, "[Portman] fails to allege facts supporting his claim that [New Line] concealed [its] actions making it impossible for him to discover his claims until after the July 15, 2005 release of the film at issue." New Line's demurrer to the fourth cause of action for unjust enrichment was also sustained on the ground that unjust enrichment is a remedy, and not a cause of action. Portman was given 30 days leave to amend as to the first, second, third and fifth causes of action.

New Line's request for judicial notice was denied.

## 3. The second amended complaint

Portman filed a second amended complaint (SAC) on December 10, 2010. It contained four causes of action for breach of written contract, misappropriation of trade secrets, fraud and deceit, and breach of implied covenant of good faith and fair dealing.

On January 14, 2011, New Line again demurred to all causes of action. New Line also filed a request for judicial notice, asking the court to take judicial notice of: (1) the complaint in the Reginald action; (2) the first amended complaint in the Reginald action; and (3) the fact that Portman was deposed twice in the Reginald action, once on May 10, 2005, and once on May 25, 2005. In its memorandum supporting the request, New Line emphasized that it was not asking the court to take judicial notice of the truth of the documents, or the accuracy of Portman's testimony, but simply to take judicial notice of

5

the existence of the documents and the fact that Portman was deposed twice in the Reginald action.

New Line's demurrer was heard on April 13, 2011, and was sustained in full without leave to amend. The court granted New Line's request for judicial notice. The court explained that "[o]n August 2, 2004, [Portman's] business partner [Reginald] filed suit against [New Line] and other[s] alleging that the Film [Wedding Crashers] was based on his ideas." The court noted that Portman was deposed twice in that action, and that the current action was filed more than four years after the Reginald action was filed. The court found that these events put Portman on notice of information or circumstances to put a reasonable person on inquiry of the potential claim.

The court further held that in order to rely on the discovery rule, Portman would have had to allege facts showing "'(1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.]" (Citing *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808.) The court noted that despite three chances, Portman still failed to allege facts supporting his position that he did not discover his claims until after the July 15, 2005 release of the film.

## 4. Final judgment and appeal

On April 20, 2011, a final judgment was filed, dismissing the SAC with prejudice. As the prevailing party, New Line was awarded costs in the amount of $1,665.99.

On June 10, 2011, Portman filed his notice of appeal from the judgment.

## DISCUSSION

## I. Standard of review

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff

6

has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.) The legal sufficiency of the complaint is reviewed de novo. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.)

Bearing these standards in mind, we review the causes of action in Portman's SAC.

## II. The applicable statutes of limitation bar Portman's claims

A plaintiff must bring a cause of action within the limitations period. (Code Civ. Proc., § 312.) The limitations period begins to run once the plaintiff has notice of information or circumstances to put a reasonable person on inquiry notice of the potential claim. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.) When a complaint discloses that the statute of limitations has run on the claims at issue, the defect may be exposed by way of demurrer. (*Guardian North Bay, Inc. v. Superior Court* (2001) 94 Cal.App.4th 963, 971-972.)

Because the trial court sustained New Line's demurrer to all four causes of action on the grounds that they were barred by the applicable statutes of limitation, we begin by discussing those statutes and the facts related to Portman's discovery of his claims. As set forth below, we conclude that the trial court properly sustained the demurrer to each cause of action on the ground that it is barred under the applicable statute of limitations.

### A. *Breach of contract*

#### 1. Applicable law

To state a cause of action for breach of contract, "a party must plead the existence of a contract, his or her performance of the contract or excuse for nonperformance, the defendant's breach and resulting damage. [Citation.]" (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.) Where an action is based on an alleged breach of a written contract, "the terms must be set out verbatim in the body of the complaint or

7

a copy of the written agreement must be attached and incorporated by reference. [Citation.]" (*Ibid*.)

## 2. Applicable statute of limitations

The statute of limitations for breach of a written contract is four years under Code of Civil Procedure section 337. Generally, a cause of action for breach of contract accrues at the time of the breach. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1120.) However, application of the delayed discovery rule may be appropriate in cases where the breach is committed in secret. (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1310.)

The statute of limitations for breach of a contract that is not based on a written agreement is two years, whether the agreement is oral or implied in fact. (Code Civ. Proc., § 339.) A claim for breach of oral contract is also subject to the delayed discovery rule. It accrues when "the aggrieved party discovers, or should discover, the existence of the cause of action." (*Seelenfreund v. Terminix of Northern Cal., Inc.* (1978) 84 Cal.App.3d 133, 136.)

Portman has captioned his breach of contract cause of action as a claim for breach of written contract. However, New Line argues that the allegations of the SAC do not support Portman's claim that a written contract between Portman and New Line ever existed. In order to determine the applicable statute of limitations, we must first examine the allegations of the SAC and determine whether they support a claim for breach of written contract, as Portman insists -- or only a claim for breach of oral or implied contract, as New Line insists.

## 3. Allegations regarding the formation and the terms of the contract

The allegations of the SAC establish the following: Portman signed an agreement with Kirshenbaum "[t]hat Portman enter into an agreement with New Line 'solely related to a proposed feature motion picture production on "party crashers" in which New Line or its affiliated production entities agree to develop.'" New Line "reviewed and signed" the agreement between Kirshenbaum and Portman, as well as an amendment to that agreement "related to future productions of [Portman] to be submitted to New Line at its

8

invitation";[2] on July 3, 2002, Portman delivered his party crashing presentation to New Line; at all times mentioned, Portman was operating in the "material capacity" of exclusive developer and co-executive producer of the party crashing project to be financed and released by New Line; on July 10, 2002, in response to Portman's submission, New Line sent Portman a written reply which specified that "at this time a comedy about party crashing is not something that New Line can get involved with," but setting forth conditions for moving forward, such as attachment of talent;[3] and that thereafter, Portman and New Line engaged in "written development, casting, production correspondence and telephonic dialogue for a period of five (5) months revolving around [Portman's] party crashing project with Jim Carrey, [Portman's] original choice of leading UTA comedic talent to star in [Portman's] party crashing project to be financed and released by New Line."

Based on these factual allegations, Portman contends that New Line "fully accepted [Portman's] party crashing project with the understanding as defined in the June 3, 2002 contract, the terms of the July 3, 2002 submission letter, and the terms of [New Line's] July 10, 2002 reply letter, that if [New Line] produced a motion picture comedy about party crashing, part and parcel with UTA leading comedic talent, [Portman] would

---

[2]    In the OC, Portman alleged that New Line "initialed" the Portman–Kirshenbaum contract, not that New Line "signed" that contract. In analyzing the sufficiency of the SAC, we may consider the differences between the two pleadings. "A plaintiff may not avoid demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877.)

[3]    In the OC, Portman alleged that in its July 10, 2002 response to his submission New Line "established written criteria that if talent were attached to plaintiffs['] party crashing comedy project, [New Line] would reconsider participating with plaintiffs in plaintiffs['] party crashing comedy project." Again, although Portman has phrased this alleged term of the reply letter differently in the SAC, we may consider the language used in the earlier pleading. (See *Cantu v. Resolution Trust Corp., supra*, 4 Cal.App.4th at p. 877.)

9

participate in the production and receive compensation afforded an exclusive developer and co-executive producer."

Portman's contention that New Line agreed in writing that Portman would participate in, or receive compensation for, any motion picture comedy about party crashing that New Line might produce, is not supported by the factual allegations of the SAC. At best, Portman alleges that there was a written agreement related to his proposal, which New Line formally turned down on July 10, 2002. While Portman alleges that the parties then engaged in further correspondence and dialogue over the next five months, there is no allegation of any further written contractual agreement arising out of those communications. Significantly, there is no allegation that New Line ever agreed in writing that it would take on Portman's project or compensate Portman for anything. In fact, Portman has failed to set out verbatim any terms of a written agreement between Portman and New Line or specify any written obligations on the part of New Line. Nor has Portman attached to the SAC a copy of any written agreement between Portman and New Line. In sum, we find that Portman has failed to allege the existence of a written contract between Portman and New Line. (See *Harris v. Rudin, Richman & Appel, supra*, 74 Cal.App.4th at p. 307; *Otworth v. Southern Pac. Transportation Co.* (1985) 166 Cal.App.3d 452, 459.)

Portman's cause of action for breach of written contract fails because the SAC does not allege any obligations on New Line's part that are based on a written contract between Portman and New Line. At best, Portman has alleged breach of an oral or implied-in-fact contract that Portman would participate in, and be compensated for, any motion picture film related to his party crashing proposal. Thus, the applicable statute of limitations for Portman's breach of contract claim is the two-year statute of limitations found in Code of Civil Procedure section 339.

### 4. Allegations regarding breach of oral or implied contract

As to the breach of the alleged contract between Portman and New Line, Portman alleges that "after five months of written correspondence and oral dialogue between [Portman], [New Line] and UTA related to [Portman's] party crashing project . . . , [New

10

Line] and UTA simultaneously stopped taking Portman's telephone calls and refused Portman access to all relevant information regarding plaintiffs' party crashing project."

Portman further alleged that New Line "breached the written contract between [Portman] and [New Line] by releasing a feature comedic motion picture about party crashers now entitled 'Wedding Crashers' produced part and parcel with leading UTA comedic talent without compensation to [Portman]."

Thus, the actual breach of the alleged agreement occurred sometime in December 2002, when Portman was excluded from the project, and culminated in the release of Wedding Crashers in July 2005.

### 5. Delayed discovery allegations and facts subject to judicial notice

However, Portman alleges that he did not discover New Line's "secret combination designed to appropriate [Portman's] party crashing project" until after the release of the film Wedding Crashers on July 15, 2005. In order to rebut the presumption that his cause of action accrued at the time of breach, Portman "must plead facts sufficient to convince a trial judge that delayed discovery was justified." (*William L. Lyon & Associates, Inc. v. Superior Court, supra*, 204 Cal.App.4th at p. 1310.)

In an attempt to satisfy this requirement, Portman alleges that New Line "set in motion a canard against [him], defined herein as a well-timed and coordinated entertainment industry tactic used against individuals or companies with competing business interests in order to gain an unfair advantage." Portman alleged that this "canard" "was designed and lodged by New Line to conceal from [Portman] the full extent of [New Line's] misappropriation of [Portman's] party crashing project." Portman alleged that New Line's "blockage of information made it extremely difficult to a point of being 'impossible' for [Portman] to commence discovery of relevant information necessary to define the full extent of New line's misappropriation of the party crashing project and its concealment related to the procurement and acceptance of the leading UTA comedic talent until after the July 15, 2005 release of 'Wedding Crashers.'"

In mid-2006, Portman further alleges that in his "continued" effort to discover all the facts about the Reginald action, he researched the file of the Reginald action at the

11

Santa Monica courthouse. Portman states that at that time he discovered a "false and misleading declaration" signed by Magnus Kim (Kim), a creative executive at New Line. In the allegedly false declaration, Kim acknowledged receipt of the "Party Crashers Handbook" in July 2002, but claimed that he only "skimmed" the work and determined that it did not merit further review by anyone at New Line. Kim also declared that he never discussed Portman's party crashing project with anyone at New Line.

Other facts related to Portman's claim of delayed discovery were provided by New Line in its request for judicial notice. The request for judicial notice filed with New Line's demurrer to the SAC sought judicial notice of the complaint in the Reginald action, filed on August 2, 2004, the first amended complaint in the Reginald action, filed on December 27, 2004, and the fact that Portman was deposed in that action twice, on May 10, 2005, and again on May 25, 2005. New Line's request for judicial notice was granted. The existence of Reginald's lawsuit against New Line, and the fact that Portman was twice deposed in that action, suggest that Portman should have become aware of the existence of his claims no later than May 10, 2005.

### 6. Application of statute of limitations

Portman's original complaint in this action was filed on July 13, 2009. The allegations of the complaint, and the facts judicially noticed, reveal that Portman should have discovered his cause of action for breach of contract in May 2005, when he was deposed in the Reginald action, or at the latest, in mid-July 2005, when Wedding Crashers was released to the general public. However, even assuming that Portman discovered his claim as late as "mid-2006," when he was delving into the file in the Reginald action, it is still barred under the two-year statute of limitations for breach of oral or implied contract.[4]

---

[4] The allegations of the SAC undermine the suggestion that Portman did not discover his claims against New Line until "mid-2006." Specifically, Portman alleges that in mid-2006 he "*continued* his effort to discover all the facts" by researching the file in the Reginald action at the Santa Monica courthouse. (Italics added.) By this allegation, Portman essentially admits that he realized earlier than mid-2006 that he

12

Thus, Portman's first cause of action for breach of contract fails as a matter of law, and the demurrer to this cause of action was properly sustained.

## B. Misappropriation of Trade Secrets

### 1. Applicable law

Misappropriation of trade secrets is an intentional tort. "A trade secret is misappropriated if a person (1) acquires a trade secret knowing or having reason to know that the trade secret has been acquired by 'improper means,' (2) discloses or uses a trade secret the person has acquired by 'improper means' or in violation of a nondisclosure obligation, (3) discloses or uses a trade secret the person knew or should have known was derived from another who had acquired it by improper means or who had a nondisclosure obligation or (4) discloses or uses a trade secret after learning that it is a trade secret but before a material change of position. [Citation.]" (*Ajaxo v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 66.)

### 2. Applicable statute of limitations

The statute of limitations on a claim of misappropriation of trade secrets, set forth in Civil Code section 3426.6, is three years. The statute provides that "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."

### 3. Facts alleged and subject to judicial notice

Portman claims that his "motion picture comedy project on party crashing produced part and parcel with UTA leading comedic talent were valuable proprietary assets of [Portman] and a legally cognizable trade secret." He alleges that New Line "circumvented [his] exclusive ownership and financial interests in the property and engaged in secret dealings with UTA related to the procurement of UTA leading comedic talent by replacing Jim Carrey with UTA leading comedic talent Vince Vaughn and Owen Wilson," and later accepted "Rachel McAdams and director David Dobkin as part of this secretly acquired UTA talent package."

---

might have a claim against New Line -- and that his suspicions prompted his visit to the Santa Monica courthouse.

13

Portman alleged that New Line's "blockage of information made it extremely difficult to a point of being 'impossible' for [Portman] to commence discovery of relevant information necessary to define the full extent of New line's misappropriation of the party crashing project and its concealment related to the procurement and acceptance of the leading UTA comedic talent until after the July 15, 2005 release of 'Wedding Crashers.'"

### 4. Application of statute of limitations

The release date of Wedding Crashers was July 15, 2005. At that time, the theme and casting of the movie was generally known to the public. On that date, Portman knew or, with the exercise of reasonable diligence, should have discovered his claims for misappropriation of trade secrets. (See, e.g., *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1237 ["there can be no question that the cause of action for defamation accrued and the statute of limitations ran from the date the book was first generally distributed to the public, regardless of the date on which plaintiff actually learned of the existence of the book and read its contents"].)[5]

---

[5] Portman cites *Nelson v. Indevus Pharmaceuticals, Inc.* (2006) 142 Cal.App.4th 1202 as support for his argument that the release date of Wedding Crashers should not have commenced the running of the statute of limitations. We find *Nelson* to be distinguishable. In *Nelson,* the plaintiff's cause of action arose from her use of the diet drug sold as Redux. The defendant argued that the plaintiff's action was barred by the statute of limitations, because the limitations period began to run when the dangers of a similar drug, known as "Fen-phen," were widely publicized. The *Nelson* court disagreed, finding that the plaintiff had no obligation to read newspapers and watch television news or otherwise seek out information not disclosed by her prescribing doctor. (*Id.* at p. 1208.) The *Nelson* court's conclusion was bolstered by Code of Civil Procedure section 340.8, which specifically provides that, in the context of toxic torts or hazardous materials, media reports do not put a person on inquiry notice for the purpose of the statute of limitations. (*Ibid.*) Here, there are no allegations suggesting that Portman was unaware of the release of the film Wedding Crashers -- or the casting of that film -- on July 15, 2005. Thus, the release of that movie imposed on Portman a duty to investigate his potential claims further, and he is charged with knowledge of matters which would have been revealed by such an investigation. (*Ibid.*)

Because Portman's cause of action for misappropriation of trade secrets was not filed until July 13, 2009, it is barred by the statute of limitations as a matter of law, and the demurrer to this cause of action was properly sustained.

### C. Fraud and deceit

#### 1. Applicable law

The elements of a cause of action for fraud and deceit are: (1) a representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage. (*Lesperance v. North American Aviation, Inc.* (1963) 217 Cal.App.2d 336, 345.) Every element of a cause of action for fraud and deceit must be alleged specifically in order for the cause of action to survive past the pleading stage. (*Ibid.*)

#### 2. Applicable statute of limitations

The statute of limitations for an action based on fraud is three years. (Code Civ. Proc., § 338, subd. (d).) The cause of action "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (*Ibid.*)

#### 3. Facts alleged

Portman alleged that New Line falsely and in bad faith represented to him that it intended to proceed with his project about party crashing. The representation was made when New Line signed the contract dated June 3, 2002, and when New Line represented in its letter of July 10, 2002, that if Portman met certain conditions, defendant would move forward with production of the project. In addition, New Line allegedly falsely represented that it intended to continue its involvement with Portman by engaging Portman in five months of dialogue "while working duplicitously and fraudulently in concert with UTA packaging 'Wedding Crashers' with UTA leading comedic talent . . . and by New Line positioning itself to benefit financially from this secret procurement of UTA talent."

In addition, Portman alleged that on the release date of Wedding Crashers, New Line and Kim intentionally signed and filed a false declaration under oath, which "omitted, misrepresented and distorted the truth" and was "a bad faith attempt by New Line to defraud [Portman] of his rights in the party crashing project, mislead the court,

15

and cover-up the extent of [New Line's] concealment." Portman alleged that he justifiably relied on these misrepresentations, resulting in financial damage and damage to his career.

### 4. Application of statute of limitations

Portman's allegations of fraud are centered around the alleged false promise that New Line intended to proceed with Portman's party crashing project and the alleged concealment of New Line's intention to go forward with the project without Portman or the UTA talent affiliated with his proposal.

The allegations of the complaint reveal that Wedding Crashers was released to the general public on July 15, 2005. Again, Portman does not allege that he was unaware of the release of that movie, or of the storyline, which he alleges was primarily about party crashing. Thus, on July 15, 2005, Portman was "aware of facts which would make a reasonably prudent person suspicious" of the fraud. (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875.) On that date, Portman had a duty to investigate further, and he is charged with knowledge of matters which would have been revealed by such an investigation. (*Ibid.*) Because Portman did not file his cause of action for fraud and deceit against New Line until July 13, 2009 -- more than three years after it accrued -- it is barred as a matter of law, and the demurrer to this cause of action was properly sustained.

### D. Breach of implied covenant of good faith and fair dealing

"A cause of action for breach of the implied covenant of good faith and fair dealing is premised on the breach of a specific contractual obligation. [Citation.]" (*Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc.* (2011) 194 Cal.App.4th 623, 631.) "'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'" (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031-1032.) "A breach of the covenant of good faith and fair dealing does not give rise to a cause of action separate from a cause

16

of action for breach of the contract containing the covenant. [Citation.]" (*Smith v. International Brotherhood of Electrical Workers* (2003) 109 Cal.App.4th 1637, 1644, fn. 3.)

Because Portman's cause of action for breach of the implied covenant of good faith and fair dealing is based "upon a contract, obligation or liability not founded upon an instrument of writing," it is subject to the two-year statute of limitations found in Code of Civil Procedure section 339.[6]

As set forth above, Wedding Crashers was released to the general public on July 15, 2005. Since this cause of action was not filed until July 2009, it is barred under the two-year statute of limitations and thus fails as a matter of law. The trial court properly sustained New Line's demurrer to Portman's cause of action for breach of implied covenant of good faith and fair dealing on statute of limitations grounds.

### III. Not an abuse of discretion to grant New Line's request for judicial notice

Portman argues that the trial court erred in granting New Line's request for judicial notice filed concurrently with its demurrer to the SAC. Portman contends that the court erred in taking judicial notice of documents which it previously declined to judicially notice. In addition, Portman claims, based on the content of those documents, the court arbitrarily adopted the date of the filing of the Reginald action as the commencement date of the running of the statute of limitations in this case.

The documents which the court judicially noticed in connection with the demurrer to the SAC were: (1) the complaint filed by Reginald on August 2, 2004; (2) the first

---

[6]     New Line suggests that Portman attempted to plead his breach of the covenant of good faith and fair dealing cause of action as a tort, therefore the three-year statute of limitations under Code of Civil Procedure section 338, subdivision (d), applies. We find that this cause of action can only be considered as a contract action. As explained in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683, "[t]he covenant of good faith and fair dealing was developed in the contract arena and is aimed at making effective the agreement's promises." Because the covenant "is a contract term, . . . compensation for its breach has almost always been limited to contract rather than tort remedies." (*Id.* at p. 684.) The single exception has been in the context of insurance law. (*Ibid.*; see also *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [favoring "a general rule precluding tort recovery for noninsurance contract breach"].)

17

amended complaint filed in the Reginald action on December 27, 2004; and (3) the fact that Portman was deposed twice in the Reginald action, once on May 10, 2005 and once on May 25, 2005, as reflected in excerpts of the transcript of the deposition.

We review a trial court's ruling on a request for judicial notice as an abuse of discretion. (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264.) A court may properly take judicial notice of the records of any court of this state. (Evid. Code, § 452, subd. (d).) Thus, the court's decision to take judicial notice of the pleadings filed in the Reginald action was within the limits of the court's discretion and did not constitute an abuse of that discretion.

A court may also take judicial notice of facts that are not reasonably subject to dispute and are capable of immediate and accurate determination by sources of reasonably indisputable accuracy. (Evid. Code, § 452, subd. (h).) "Strictly speaking, a court takes judicial notice of facts, not documents. [Citation.]" (*Fontenot v. Wells Fargo Bank, N.A., supra*, 198 Cal.App.4th at p. 265.) The court's decision to take judicial notice of the fact that Portman was deposed in the Reginald action on May 10, 2005, and May 25, 2005, was within the limits of the court's discretion under Evidence Code section 452, subdivision (h), and did not constitute an abuse of discretion.

Portman alleges that the court acted in excess of its authority by misinterpreting the documents and mischaracterizing the relationship between Portman and Reginald. Portman has failed to convince us that the trial court interpreted the documents, and any mischaracterization of the relationship between Portman and Reginald is irrelevant and therefore harmless. (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 569 ["'the improper taking of notice is subject to harmless error analysis'"].)

## IV. Not an abuse of discretion to deny leave to amend

The trial court denied Portman leave to amend after his third attempt to adequately allege his claims against New Line. "[A] demurrer may be sustained without leave to amend where it is probable from the nature of the complaint and the previous unsuccessful attempt[s] to plead that the plaintiff cannot state a cause of action." (*Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 153.) In addition, Portman

has not made any showing as to how he might cure the defects of the SAC. (See *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [plaintiffs have "the burden of proving that an amendment would cure the defect[s]"].) We therefore conclude that the trial court did not abuse its discretion in denying Portman leave to amend.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

19