Filed 11/19/15  Bottini v. Legacy 106 CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| FRANCIS A. BOTTINI, JR., Individually and as Trustee, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LEGACY 106, INC., et al., <br><br> Defendants and Respondents. | D067119 <br><br><br> (Super. Ct. No. <br> 37-2014-00009873-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Bottini & Bottini, Albert Y. Chang and Yury A. Kolesnikov for Plaintiff and Appellant.

Treitler & Hager, Barry E. Hager, Maasch Law, Inc., and Mark A. Maasch for Defendants and Respondents.

In 2009 property owner Taylor wanted to have her property designated as a historical site and signed a contract (the consulting services contract) with defendant

Legacy 106, Inc. (Legacy) to assist her in her application. The consulting services contract provided Legacy would (1) prepare a report and supporting documentation (the Report) to submit as part of her application to the Historical Resources Board (HRB) for the City of San Diego (City) to have the property designated a historical site, and (2) defend the Report at any hearing before the HRB on her application. Legacy prepared the report, submitted it to City in early 2010 and, at Taylor's direction, provided a copy of the Report to the La Jolla Historical Society (LJHS) around the same time.

Subsequently, during the pendency of Taylor's application, she sold the property to plaintiff Bottini.[1] Taylor also executed a February 16, 2011, assignment (the assignment) that assigned to Bottini her rights in the application filed with City concerning the property. Bottini then withdrew the application, obtained a permit to (and did) demolish the structure on the property, and submitted building plans that were approved based, in part, on a determination the new building project was exempt from the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). LJHS, along with another group, appealed the approval to the city council for City (the Appeal). The Appeal was successful and required an environmental review of Bottini's proposed project (City's Ruling).

In this action, Bottini alleges Legacy is liable for the damages it suffered from City's Ruling. It alleges Legacy participated in the Appeal by giving the Report to LJHS

---

[1] The buyer was the "Bernate Ticino Trust, dated 3/2/09," and Francis A. Bottini, Jr., is a trustee of that trust. For ease of reference, we collectively refer to both plaintiffs as Bottini.

2

and City, which provided support for the Appeal's contention the property had historic significance and therefore required CEQA compliance, and City's Ruling adverse to Bottini was based on this alleged historic significance. Bottini's complaint against Legacy pleaded claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and breach of the implied covenant of good faith and fair dealing. Legacy moved to strike the action pursuant to Code of Civil Procedure section 425.16,[2] commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) Legacy argued the alleged wrongful conduct on which Bottini's lawsuit was based fell within the protection of the anti-SLAPP law as conduct in furtherance of a person's right to petition or of free speech, and because Bottini could not show probable success on the merits, the court should strike the complaint and award Legacy attorney fees under the anti-SLAPP statute. The trial court agreed, granted Legacy's motion to strike and awarded attorney fees to, and entered judgment for, Legacy.

On appeal, Bottini argues the anti-SLAPP law was inapplicable because none of the claims against Legacy arose from protected conduct, but instead arose from Legacy's interference with Bottini's contractual rights, and any protected conduct was merely incidental to the unprotected conduct. Bottini alternatively asserts that, even if the anti-

---

[2]     All statutory references are to the Code of Civil Procedure unless otherwise specified.

3

SLAPP law does apply, the trial court's ruling must be reversed because Bottini adequately demonstrated a probability of success on the merits. Finally, Bottini argues the court abused its discretion in the amount of the attorney fee award because the evidence did not adequately support the amount of fees incurred by Legacy.

I

FACTUAL BACKGROUND

A. The Parties

Defendant Legacy performs consulting work in the areas of archeology and historic preservation, including researching and preparing reports for use in the historical designation process. Defendant Ronald May, who cofounded Legacy and is its President and principal investigator, has had a lengthy career in the fields of archeology and historic preservation. May believes in the need to preserve structures of historical significance and will not accept work from persons who do not support historical designation for a house or building for which he has been asked to prepare a nomination.

Plaintiff Francis A. Bottini, Jr., is a trustee of plaintiff Bernate Ticino Trust, dated 3/2/09. In early 2011, Bottini acquired the Property, located in La Jolla, California, from Taylor, and obtained the assignment that, among other things, conveyed Taylor's rights to the application for historical designation of the Property then pending before the HRB.

B. The Contract, Report and Nomination Proceedings

In late 2009 Taylor and Legacy entered into the consulting services contract that provided Legacy would perform independent consulting services to Taylor, including (1)

4

researching and preparing the Report to submit as part of her application to the HRB to have the Property designated a historical site, and (2) appearing at a hearing before the HRB on her application to defend the Report. Legacy researched and prepared the report and submitted a copy of it to the staff of HRB in connection with Taylor's application around March 1, 2010. Legacy gave copies of the Report to Taylor and also, with Taylor's permission, provided a copy of the Report to the LJHS. As of that time, Legacy's only remaining task under the consulting services contract was to appear before the HRB to defend the Report.

Sometime after the Report was filed, Legacy learned Taylor decided to sell the Property to Bottini.[3] In May 2011 Bottini contacted City and withdrew the nomination. Legacy subsequently learned Bottini had withdrawn the nomination and therefore Legacy's only remaining obligation under the consulting services contract—to appear before the HRB to defend the Report—became moot.

C. Subsequent Proceedings Before Governmental Agencies

Bottini submitted a request for a preliminary review to determine the historical significance of the Property, apparently in contemplation of seeking permission to demolish the existing structure in order to build a new house, which triggered a review

---

[3] Around the same time, Taylor entered into the assignment with Bottini. Under the assignment, Taylor agreed to assign to Bottini all "legal and beneficial right . . . to requests and/or applications for historical designation of the Property, including . . . the application currently pending with [HRB]," and to allow Bottini to be substituted in her place on the currently pending application. Taylor also "transfer[red] to [Bottini] . . . a copy of all underlying and supporting documentation regarding historical designation of the Property."

5

process by the HRB to determine whether to historically designate the Property. The HRB hearing took place in September 2011 and the HRB did not designate the Property. In December 2011 Bottini applied for and obtained a demolition permit, and the structure on the property was demolished. Legacy did not speak at any of these governmental proceedings.

Bottini subsequently applied for a coastal development permit to build a new single family residence on the now vacant lot. City's staff determined the proposed project would not have the potential for causing a significant effect on the environment and was exempt from CEQA. In February 2013, the Appeal of that determination was filed by LJHS and another group. May shared the concerns of LJHS regarding the permitting process that had been followed, and communicated his position to the city council by a June 24, 2013, email that outlined his concerns over how the project had been improperly "piecemealed," and how City's staff had sought to suppress use of the Report during the hearing before the HRB and other public hearings, and urged the city council to uphold the Appeal and require Bottini to submit an environmental impact report (EIR) for the project.

In September 2013 city council adopted a resolution granting the Appeal. The resolution included a finding citing the Report (along with the LJHS's nomination and other evidence) as support for the finding the project could have significant impact on historical resources and therefore required an EIR for the project. Because the project

has been delayed and Bottini is now required to prepare an EIR for the project, Bottini has suffered losses.

II

PROCEDURAL BACKGROUND

A. <u>The Lawsuit</u>

Bottini filed this action against Legacy and May (hereafter together referred to as Legacy), pleading claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and breach of the implied covenant of good faith and fair dealing, alleging it was damaged because Legacy's actions led to the city council resolution. Bottini's lawsuit alleged, in essence, that the Report belonged to Bottini (by way of assignment from Taylor) but was used by Legacy (either directly or by giving it to LJHS or others to use) in ways inimical to Bottini's interests, including use of the Report to support the Appeal and to induce the city council to grant the Appeal.

B. <u>The Anti-SLAPP Motion and Ruling</u>

Legacy moved to strike the complaint under the anti-SLAPP statute. The motion argued the core conduct underlying Bottini's claims was protected conduct, because the claims rested on publications made by Legacy as to matters pending before a governmental agency, all of which fell within the protections afforded by section 425.16, subdivision (e). Legacy argued this satisfied the prima facie showing required for application of the anti-SLAPP statute and therefore shifted the burden to Bottini to

7

demonstrate probable success on the merits. Legacy argued Bottini could not satisfy the burden of showing probable success on the merits, and therefore argued the complaint should be dismissed and Legacy should recover attorney fees.

Bottini opposed the motion, asserting first that Legacy had not satisfied the prima facie burden of showing the anti-SLAPP statute applied to the claims asserted by Bottini's lawsuit. Bottini contended the first prong was not satisfied because Legacy was paid to generate the Report for submission to the governmental agency and therefore submission of that report was not an act by Legacy in furtherance of the right to petition or free speech under the rationales of *Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers* (1996) 49 Cal.App.4th 1591 (*Ericsson*) (disapproved on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 and *Equilon Enterprises v. Consumer Cause, Inc. supra,* 29 Cal.4th at p. 68, fn. 5) and *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921 (*Kajima*). Bottini alternatively contended the first prong was not satisfied because the pleaded claims were based primarily on unprotected activity and any protected activities were only incidental to Bottini's claims, and the lawsuit did not "arise from" protected activities. Bottini also argued that, even assuming the prima facie showing had been made by defendants, it had shown probable success on the merits.

The trial court concluded all of Bottini's causes of action were rooted in the communications by Legacy (which Bottini alleged were wrongful and caused its injury) regarding the historical nomination for the Property. The court concluded those

8

communications were the type of conduct qualifying for protection under section 425.16, and rejected Bottini's arguments that the allegedly wrongful communications fell outside the ambit of section 425.16 as representing commercial activity for which section 425.16 provides no protection. The trial court also concluded Bottini had not shown probable success on the merits because all of the conduct alleged to have been wrongful and injurious to Bottini were absolutely privileged. Accordingly, the court granted Legacy's motion to strike Bottini's claims.

The court also concluded Legacy was entitled to attorney fees and ordered further briefing on the amount sought by Legacy. After consideration of the relevant factors, and after disallowing a portion of the fees sought by Legacy, the court found that attorney fees in the amount of $23,112 were reasonable and awarded Legacy attorney fees in that amount. After judgment was entered, Bottini timely appealed.

III

ANALYSIS OF RULING ON ANTI-SLAPP MOTION

A. The Anti-SLAPP Statute: Legal Framework

The anti-SLAPP statute is available "to provide for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 315.) The Legislature authorized the filing of a special motion to strike those claims (§ 425.16, subds. (b)(1), (f)), and expressly provided that section 425.16 should "be construed broadly." (*Id.* at subd. (a).)

To determine whether a cause of action should be stricken under the anti-SLAPP statute, section 425.16 establishes a two-step test. In the first step, the party bringing the motion has the initial burden of showing that the cause of action arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.) To meet this threshold showing, the defendant must show that the conduct on which the plaintiff's claims are based is conduct falling within one of the four categories of conduct described in section 425.16, subdivision (e). (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1569.) Those four categories are: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

If the defendant meets this threshold showing, the burden then shifts to the plaintiff to demonstrate a probability of prevailing on the cause of action. (§ 425.16, subd. (e).) " 'To demonstrate a probability of prevailing on the merits, the plaintiff must show that the complaint is legally sufficient and must present a prima facie showing of

10

facts that, if believed by the trier of fact, would support a judgment in the plaintiff's favor.' " (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679.) A plaintiff does not meet this burden by simply relying on the allegations of the complaint, but instead must produce evidence that would be admissible at trial. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) The court cannot weigh this evidence, but instead determines whether the evidence is sufficient to support a judgment in the plaintiff's favor as a matter of law. (*Ibid.*)

Only when a cause of action satisfies both parts of the anti-SLAPP statute—i.e., it arises from protected speech or petitioning and lacks minimal merit—is that claim subject to being stricken under the statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).) On appeal, we independently review the trial court's order granting a special motion to strike under section 425.16. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*).)

B. Analysis

Our independent review convinces us the trial court correctly held Legacy satisfied the first prong, by showing Bottini's lawsuit was premised on protected activity, and correctly found Bottini did not show probable success on the merits.

*The Threshold Showing of Anti-SLAPP Application Was Met*

We begin with an examination of whether Legacy satisfied the first prong. "The sole inquiry under the first prong of the anti-SLAPP statute is whether the plaintiff's claims arise from protected speech or petitioning activity. [Citation.] Our focus is on the

11

principal thrust or gravamen of the causes of action, i.e., the allegedly wrongful and injury-producing conduct that provides the foundation for the claims. [Citations.] We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.' " (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 490-491 (*Castleman*), quoting *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1389.)

We are convinced, from the allegations of the complaint and the declarations filed by the parties, that the "allegedly wrongful and injury-producing conduct that provides the foundation" (*Castleman, supra,* 216 Cal.App.4th at p. 490) for Bottini's damages consisted of Legacy's communications to the city council advocating for the historical designation of the Property and the concomitant requirement that Bottini file an EIR for its Project, and this is the conduct that caused the injury for which Bottini sought recovery. We are also convinced, and Bottini does not dispute, that direct communications to a political body conducting CEQA proceedings fall squarely within the type of conduct protected under the anti-SLAPP statute (*Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 743-744), and the anti-SLAPP protections apply with equal force to conduct that provides encouragement or support to third parties who directly communicate to the relevant political body. (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 16-18.) Because Bottini's complaint alleges injury from both Legacy's direct communications (e.g., Legacy's emails to the city council advocating in favor of

12

LJHS's Appeal and citing the Report) and indirect communications (e.g., providing the Report to third parties to support the third parties' advocacy in favor of the Appeal), Bottini's claims "arise from" protected conduct within the meaning of the anti-SLAPP statute.

Bottini asserts the trial court erred in finding Legacy satisfied the first prong because, under *Ericsson*, *supra*, 49 Cal.App.4th 1591, and *Kajima, supra,* 95 Cal.App.4th 921, communications with governmental agencies in the regular course of business and in satisfaction of contractual undertakings are acts purely for financial gain, rather than acts in furtherance of the right of petition or free speech, and therefore fall outside the protection of the anti-SLAPP statute. Bottini argues that, because the Report was generated and submitted in satisfaction of Legacy's contractual undertaking with Taylor, it is outside the protection of the anti-SLAPP statute and, under *Episcopal Church Cases* (2009) 45 Cal.4th 467 (*Episcopal*), a lawsuit the gravamen of which is a business dispute is not subject to an anti-SLAPP motion merely because protected activity "may lurk in the background" or even have been a precipitant of the business dispute. (*Episcopal,* at pp. 478, 477-478.) We are not persuaded by Bottini's arguments because we conclude the language from *Ericsson* on which Bottini relies has been eviscerated by *Navellier, supra,* 29 Cal.4th 82, and neither *Kajima* nor *Episcopal* provide relevant support for Bottini's arguments.

In *Ericsson*, two communications companies submitted competing bids to supply and install a communications system for a governmental agency, and the losing bidder

13

(Ericsson) sued a consultant retained by the agency because the consultant recommended the competing company's proposal. The lawsuit alleged the consultant (by breaching its contractual obligation to the agency when it did not provide an objective analysis of the competing bids) was liable to Ericsson for intentional interference with economic advantage. (*Ericsson*, *supra*, 49 Cal.App.4th at pp. 1594-1596.) The consultant moved to strike the complaint under the anti-SLAPP statute, and the appellate court deemed the central issue to be whether "conduct undertaken in furtherance of a contractual obligation" can qualify as an act made "in furtherance of the right of free speech" for purposes of the first prong of the anti-SLAPP statute. (*Id*. at p. 1598.) The *Ericsson* court held the anti-SLAPP statute applies "only in those cases where the party acted for the purpose of promoting or advancing his or her right of free speech, in contrast to one where the parties are performing or breaching their contractual obligations" (*id.* at p. 1601), and concluded that when the alleged wrongful conduct was "related to the performance of [the defendants'] contractual obligations, and were not motivated by their desire to promote or advance their right of free speech, the first prong of the test has not been met." (*Id*. at p. 1602.) Relying on this language and approach, Bottini asserts Legacy's Report was generated in fulfillment of a contractual undertaking rather than to promote Legacy's right to free speech, and therefore an action based on breach of that contractual undertaking does not satisfy the first prong of the anti-SLAPP statute even though it was submitted to a governmental agency.

14

However, in *Navellier, supra*, 29 Cal.4th 82, our high court disapproved *Ericsson's* approach, stating at page 92:

> "Although *Ericsson* . . . questioned the applicability of section 425.16 to 'breach of contract or fraud actions where the act of the [defendant] relates to the formation or performance of contractual obligations and not . . . to the exercise of the right of free speech' (*Ericsson*, *supra*, 49 Cal.App.4th at pp. 1601-1602), that comment cannot be reconciled with the plain language of the anti-SLAPP statute.  Nothing in the statute itself categorically excludes any particular type of action from its operation, and no court has the ' "power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." ' [Citation.]  For us to adopt such a narrowing construction, moreover, would contravene the Legislature's express command that section 425.16 'shall be construed broadly.' [Citation.]  [¶]  The logical flaw in plaintiffs' argument is its false dichotomy between actions that target 'the formation or performance of contractual obligations' and those that target 'the exercise of the right of free speech.' (*Ericsson*, *supra*, 49 Cal.App.4th at p. 1602.)  A given action, or cause of action, may indeed target both.  As the facts in this lawsuit illustrate, conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning.  The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning. [Fn. omitted.]"

The *Navellier* court went on to explain that including contract and fraud claims within the operation of the anti-SLAPP statute does not mean a defendant *cannot* be sued for breaching his or her promises merely because the alleged breach involved petitioning activities, but only means that when such petitioning activity constitutes the alleged wrongful conduct, the anti-SLAPP statute "subjects to potential dismissal only those actions in which the plaintiff cannot 'state[] and substantiate[] a legally sufficient claim' [citation]." (*Navellier*, *supra*, 29 Cal.4th at p. 93, fn. omitted.)

15

Here, the allegedly wrongful and injury-producing conduct that provides the foundation for Bottini's claimed injuries *was* that Legacy communicated the Report (either directly or indirectly) to the city council in connection with the Appeal.  Although Bottini's complaint alleged that conduct *also* breached some contractual duty or other obligation owed by Legacy to Bottini, the anti-SLAPP statute nevertheless applies to its action and Bottini may proceed with its claims only if it can state and substantiate a legally sufficient claim.  (Accord, *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271-274 [where actions that allegedly breached the contract necessarily and essentially constituted petitioning activity, first prong satisfied].)

Bottini's citation to *Kajima, supra,* 95 Cal.App.4th 921 for the proposition that the anti-SLAPP statute does not apply to "conduct in furtherance of a business engagement," is even less persuasive.  First, the language from *Kajima* on which Bottini apparently relies cited *Ericsson* as support for that proposition, and *Navellier* has effectively abrogated that approach.  (See *Midland Pacific Bldg. Corp. v. King, supra,* 157 Cal.App.4th at p. 272.)  Second, *Kajima* merely held that a fraud cause of action, which alleged in part that the defendant submitted false claims for payment to the government in the regular course of business, was "simply . . . not an act in furtherance of the right of petition or free speech within the meaning of the anti-SLAPP statute."  (*Kajima, supra,* 95 Cal.App.4th at pp. 932, 929.)  In contrast, the alleged wrongful conduct at the core of Bottini's action *is* that Bottini was injured *because* Legacy engaged in conduct in furtherance of the right of petition or free speech.  *Kajima* is of no aid to Bottini.

16

Bottini alternatively argues its claims against Legacy do not "arise from" protected activities because it was rooted in misconduct that is unprotected, such as Legacy's "feign[ing] compliance with the terms of the Assignment" while taking "secret and undisclosed steps to interfere with [Bottini's] property interests," and sending the Report to third parties and encouraging them to use the Report in ways inimical to Bottini's interest, and posting the Report on Legacy's website. Bottini argues these allegations show Legacy engaged in unprotected misconduct and cannot satisfy the first prong of the anti-SLAPP statute, and the mere fact Bottini's complaint *also* contains " 'collateral allusions to protected activity' " (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 575), or that protected activity "may lurk in the background" or have been a precipitant of the business dispute (*Episcopal, supra,* 45 Cal.4th at pp. 478, 477-478), does not bring Bottini's claim within the first prong of the anti-SLAPP statute.

These arguments are without merit. For example, Bottini's allegations that Legacy concealed its petitioning activities (i.e. by "feign[ing] compliance" while taking "secret and undisclosed steps to interfere with [Bottini's] property interests") does not remove Bottini's claims from the first prong of the anti-SLAPP statute. (See, e.g., *Ludwig v. Superior Court, supra,* 37 Cal.App.4th at p. 20 [where gravamen of claim is that plaintiff was injured because defendant engaged in petitioning activity of filing a lawsuit, allegation that defendant "fail[ed] to reveal his role in the lawsuits . . . is of no assistance" to argument that first prong was not satisfied].) Similarly, the allegation Legacy sent the Report to third parties and encouraged them to use the Report in the CEQA appeal is

17

insufficient to remove Bottini's claims from the first prong of the anti-SLAPP statute. (*Id*. at pp. 16-19 [fact that defendant supported or encouraged others to undertake petitioning activity injurious to plaintiff does not remove claim against defendant seeking to recover for such injury from anti-SLAPP statute]; cf. *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1115 [landlord's suit against nonprofit corporation that counseled tenants in landlord-tenant disputes alleging defendant gave false advice to a tenant; court held that " '[j]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], . . . such statements are equally entitled to the benefits of section 425.16' "].)  Finally, Bottini's allegation Legacy posted the Report on Legacy's website does not preclude application of the anti-SLAPP statute to Bottini's complaint.  (See, e.g., *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 895-898.)

We are equally unpersuaded by Bottini's argument its claims are rooted in unprotected conduct and that the references to protected conduct are only incidental to its claims.  (See, e.g., *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 653 [when allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, complaint not subject to anti-SLAPP statute].)  To the contrary, the principal thrust or gravamen of Bottini's claims—"i.e., the allegedly wrongful *and injury-producing conduct* that provides the foundation for the claims" (*Castleman, supra,* 216 Cal.App.4th at pp. 490-491, italics added)—is necessarily the

18

petitioning activity of LJHS and others that Legacy encouraged and supported. Bottini suffered no other injury from Legacy's allegedly wrongful conduct apart from the impact it had in such petitioning activities, and therefore Bottini's claims are necessarily and centrally founded on protected conduct. (See *South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 669, 668-670 [defendants filed specific plan that interfered with development of plaintiff's property, and plaintiff sued defendants for breach of contract and other contract claims; court held anti-SLAPP applied because plaintiff "claims a dispute has arisen over whether the exercise of constitutional rights by . . . defendants violates a contract. In this case, the protected activity does not just lurk in the background. It is the alleged cause of [the plaintiff's] injury."].)

*Bottini Did Not Show Probable Success on the Merits*

The Litigation Privilege Bars the Action

Bottini asserts the trial court erred when it concluded the litigation privilege precluded Bottini from showing probable success on the merits. "The litigation privilege is . . . relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing. [Citing *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926-927.]" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323.) As explained by the court in *Kashian v. Harriman, supra,* 98 Cal.App.4th at page 913:

> "The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. [Citation.] . . . Although originally applied only to defamation actions, the privilege has been extended to *any*

19

communication, not just a publication, having 'some relation' to a judicial proceeding, and to *all* torts other than malicious prosecution. [Citation.] Moreover, '[t]he litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action. [Citation.] [¶] . . . [¶] . . .' [Quoting *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303.] [¶] If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law. [Citation.] Any doubt about whether the privilege applies is resolved in favor of applying it."

Thus, the litigation privilege extends to protect actions in proceedings before administrative boards and quasi-judicial proceedings (*Imig v. Ferrar* (1977) 70 Cal.App.3d 48, 55), and applies to communications or publications made outside of the proceedings themselves. (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955.) The privilege also protects noncommunicative acts necessarily related to communicative conduct as long as the gravamen of the action is the communicative acts. (*Rusheen, supra,* 37 Cal.4th at pp. 1062-1063.) Here, all of Bottini's claims assert, as the "allegedly wrongful *and injury-producing conduct* that provides the foundation for the claims" (*Castleman, supra,* 216 Cal.App.4th at pp. 490-491, italics added), that Bottini was injured because Legacy (in alleged violation of its obligations) communicated the Report to the city council in connection with the Appeal, either directly (via Legacy's email) or indirectly (by giving it to LJHS or others to use to support the Appeal). Under these circumstances, the litigation privilege precludes Bottini from demonstrating probable success on the merits.

20

Bottini asserts that, because the litigation privilege " ' "applies only to communicative acts and does not privilege tortious courses of conduct" ' " (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 830 [quoting *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 345] (*LiMandri*)), it was error to apply the privilege here because Bottini's lawsuit *did* allege Legacy engaged in an actionable noncommunicative course of conduct, i.e. Legacy allegedly misappropriated the Report, and gave the Report to third parties as part of a conspiracy with the third parties to interfere with Bottini's property rights. However, Bottini's complaint alleges no injury from the alleged misappropriation apart from the injury flowing from the communicative course of conduct of providing the Report to third parties for use in the Appeal.[4]

Bottini argues that, under *LiMandri, supra,* 52 Cal.App.4th 326, and *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4th 392, it was error to apply the litigation privilege here.[5] Although this court in *LiMandri* held the litigation privilege

---

[4] Bottini's assertion of a "conspiracy" does not remove Legacy's conduct from the umbrella of the privilege. As the court explained in *Rusheen, supra,* 37 Cal.4th at page 1062, "a civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed. The elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design." Accordingly, *Rusheen* explained that where the allegedly wrongful conduct causing damage was itself within the ambit of the privilege, the allegations of conspiracy do not obviate application of the privilege. (*Id*. at pp. 1062-1064.) Here, the object of the conspiracy and the alleged wrongful conduct was the use of the Report to support the Appeal, and therefore the privilege applies.

[5] Bottini also cites *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153 to argue that, whenever a claim is made for breach of fiduciary duty against an

21

did not bar a claim for intentional interference with contractual relations when based on an alleged tortious course of conduct and only one act within that course of conduct was protected by the litigation privilege, this court's underlying rationale was that the alleged tortious conduct was the creation of a competing and superior security interest in certain proceeds, and the only privileged conduct (the filing of a notice of lien) caused no additional injury.  (See *LiMandri, supra*, 52 Cal.App.4th at p. 345 ["While the isolated act of filing Security's notice of lien was communicative, it was only one act in the overall course of conduct . . . [*and in*] *any event . . . the filing of Security's notice of lien did not create the competing lien which interfered with LiMandri's contractual relations; it merely gave notice that Security was asserting the lien.*"].)  Here, in contrast, the *only* injury alleged by Bottini is rooted in the privileged conduct of using the Report to persuade the city council to uphold the Appeal.  *LiMandri* is therefore inapposite.

Bottini's reliance on *Mattco Forge, Inc. v. Arthur Young & Co., supra,* 5 Cal.App.4th 392 is even less apposite.  There, the plaintiffs brought an action against an accounting firm that provided the plaintiffs with litigation support, alleging professional malpractice, fraud, negligent misrepresentation, breach of fiduciary duty, breach of

agent, the litigation privilege should not apply even though the actionable breach was a statement otherwise protected by the litigation privilege had it been made by a disinterested third party.  However, *Fremont* involved a disclosure by an attorney, and the *Fremont* court declined to apply the privilege because it would preclude actions by a former client against an attorney for breach of professional duties arising from communicative conduct in litigation on behalf of that client, thereby obviating all malpractice claims against attorneys involved in litigation, which "would undermine the attorney-client relationship and would not further the policies of affording free access to the courts and encouraging open channels of communication and zealous advocacy." (*Id*. at p. 1174.)  No similar considerations apply here.

contract, tortious breach of the implied covenant of good faith and fair dealing, constructive trust, and fraudulent concealment, all of which were premised on defendants' allegedly negligent work as damage consultants and expert witnesses in the plaintiffs' action against a third party. The trial court granted the defendants' motion for summary judgment based on its conclusion the litigation privilege shielded defendants from liability. (*Id*. at pp. 396-401.) The appellate court reversed, concluding the litigation privilege does not shield a party's own witness from an action by the party arising from the expert's negligence, reasoning application of the privilege in such cases would not further the underlying policies of the privilege. (*Id*. at pp. 404-406.) Here, Bottini's injury does not flow from any alleged negligence in preparing the Report, but instead flowed from the communication of the Report, rendering *Mattco* inapposite.

The Underlying Merits of Bottini's Claims

Even without the bar of the litigation privilege, our independent review of the trial court's order (*Rusheen, supra,* 37 Cal.4th at p. 1055) convinces us the trial court correctly granted the motion to strike because Bottini did not establish probable success on the merits as to any of the pleaded claims.

Bottini's claim for intentional interference with contractual relations requires proof of "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co. v. Bear Stearns &*

*Co.* (1990) 50 Cal.3d 1118, 1126.) The complaint alleged Bottini had a contract with Taylor by which she assigned certain rights to them, and Bottini's showing on the second prong below included the assignment. The assignment by which Taylor (1) assigned to Bottini "all legal and beneficial right, title and interest in and to requests and/or applications for historical designation of the Property, including but not limited to the application currently pending with [HRB]" and granted Bottini the option to have its name substituted for Taylor in the pending application; (2) agreed not to file any future applications for historical designation or to hinder Bottini from developing the Property; and (3) agreed to transfer to Bottini "a copy of all underlying and supporting documentation regarding historical designation of the Property." However, neither the complaint, nor Bottini's showing on the second prong in opposition to the anti-SLAPP motion, contained evidence from which a trier of fact could conclude *Taylor* failed to perform *any* of these obligations.[6]

Bottini's claim for intentional interference with prospective economic advantage fares no better. "The five elements for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant

---

[6] Bottini's theory below, which it resurrects on appeal, is that Taylor breached her obligations because of *Legacy's* misconduct. Bottini cites no authority that Taylor can be held liable for breach of contract based on the alleged misconduct of third parties, nor does the record contain any suggestion that Bottini claims Taylor failed to satisfy any of *her* contractual obligations to Bottini.

designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.) The principal distinctions between this cause of action and a cause of action for intentional interference with contractual relations are (1) the former does not require proof of a legally binding contract, and (2) a broader range of privilege to interfere is recognized when the relationship is only prospective. (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at p. 1126.) The same flaw is fatal to Bottini's claim for intentional interference with prospective economic advantage: neither the complaint nor Bottini's showing on the second prong in opposition to the anti-SLAPP motion contained evidence from which a trier of fact could conclude Bottini's relationship *with Taylor* was interfered with by anything Legacy did or failed to do. Because the evidence was undisputed that Taylor complied with all of her contractual obligations to Legacy and did nothing to interfere with Bottini's attempts to develop the Property, the fact that *Legacy* may have interfered with Bottini's attempts to develop the Property does not support a claim that Legacy is liable for intentionally interfering with Bottini's prospective economic relations *with Taylor*.

Bottini's principal claim rests on the theory that Legacy is liable for breach of the covenant of good faith and fair dealing owed to Bottini as assignee of the consulting services contract. Specifically, Bottini argues (1) Legacy owed its principal (Taylor) certain obligations under the consulting services contract, including the implied covenant of good faith and fair dealing; (2) Taylor assigned the consulting services contract to

25

Bottini, which succeeded to all of Taylor's rights by virtue of the assignment; and (3) Legacy breached the implied covenant of good faith and fair dealing implied in the consulting services contract by supporting historical designation of the Property contrary to the interests of Legacy's new principal, i.e. Bottini.

As this court explained in *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026 (*Racine*): "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. [Citation.] 'The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' [Citation.] . . . 'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' [¶] . . . [¶] There is no obligation to deal fairly or in good faith absent an existing contract." (*Id*. at pp. 1031-1032.)

Bottini did not show probable success on the merits on its claim for breach of the covenant of good faith and fair dealing, for several reasons. First, Bottini provided no evidence Taylor actually purported to assign the consulting services contract to it. Although the assignment specifically employed the term "assign" when it described Taylor's intent to convey to Bottini all of her "right, title and interest in and to requests and/or applications for historical designation of the Property, including but not limited to

26

the application currently pending with [HRB]," it nowhere mentions any intent to "assign" Taylor's rights under the consulting services contract, but instead only states she agreed to transfer to Bottini "a copy of all underlying and supporting documentation regarding historical designation of the Property."[7] Moreover, even if the agreement could have been read to encompass an intent to assign her rights under the consulting services contract, Bottini at most would have succeeded to her remaining rights under the contract. (See *Searles Valley Minerals Operations Inc. v. Ralph M. Parsons Service Co.* (2011) 191 Cal.App.4th 1394, 1402 [assignment merely transfers interest of assignor; assignee "stands in the shoes" of assignor and takes his or her rights and remedies subject to any defenses the obligor has against the assignor prior to notice of the assignment].) It is undisputed that Legacy's only remaining obligation under the consulting services contract was to appear before the HRB to defend the Report, but Bottini's decision to withdraw the application excused Legacy's only remaining obligation. Ordinarily, there is no implied covenant of good faith absent existing contractual obligations (*Racine,*

---

7        Bottini peremptorily asserts that Taylor's agreement to transfer "a copy of all underlying and supporting documentation" conveyed ownership of the Report to Bottini, and therefore Legacy misappropriated Bottini's property (the Report) when it provided a copy of the Report to LJHS. Bottini provides neither legal nor factual support for this assertion. As a legal matter, it appears that a work produced by an independent contractor under commission, as here, is *not* a "work for hire" under which the commissioning party acquires ownership of the copyright for the work, but instead the author retains ownership of the work absent narrow exceptions not applicable here. (See, e.g., *Community for Creative Non-Violence v. Reid* (1989) 490 U.S. 730, 741-751.) Bottini provides no legal support for its claim that Taylor owned the Report and transferred ownership of the Report to Bottini. As a *factual* matter, even had Taylor "owned" the Report, the only *evidence* was that Legacy gave a copy of the Report to LJHS with Taylor's permission *before* Taylor purportedly assigned the Report to Bottini.

27

*supra,* 11 Cal.App.4th at p. 1032), and Bottini cites no authority suggesting that, once all of an obligor's express contractual covenants have been performed or excused, the obligee can nevertheless sue the obligor for breach of the implied covenant of good faith and fair dealing.

More importantly, Bottini cites no law permitting an assignment of a contract retaining the services of an independent contractor, such as the instant one, without the consent of the independent contractor. A personal services contract is not one that would normally be considered assignable under California law. (See, e.g., *Coykendall v. Jackson* (1936) 17 Cal.App.2d 729 [holding contract for personal services cannot be assigned, nor can such a contract be specifically enforced]; Civ. Code, § 3390 [providing obligation to render personal service cannot be specifically enforced]; *Madison v. Moon* (1957) 148 Cal.App.2d 135, 144-145 [recognizing rule that contract for personal services may not be assigned in the absence of consent and approval of the other party].) Other jurisdictions recognize the same rule.[8] The undisputed evidence showed the consulting

---

[8]     (See, e.g., *Alldredge v. Twenty-Five Thirty-Two Broadway Corporation* (Mo. Ct. App. 1974) 509 S.W.2d 744, 749 [holding employment contract is not enforceable by the employer's assignee]; *Perthou v. Stewart* (D. Ore. 1965) 243 F.Supp. 655, 659 [holding covenant not to compete included in employment agreement entered into by an employee is not enforceable by successor to the employer since the employment agreement is a personal service contract that cannot be assigned: "The fact that a person may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his freedom for the benefit of a stranger to the original undertaking."); *SDL Enterprises, Inc. v. DeReamer* (Ind. Ct. App. 1997) 683 N.E.2d 1347, 1349-1350 [holding personal service contracts are not assignable; thus, where personal service contract was assigned, assignee had no right to enforce the covenants].)

28

services contract involved the provision of personal services by Legacy to Taylor, and that Legacy declined to work for persons whose objectives are inconsistent with Legacy's belief in the need to preserve structures of historical significance. Because the foregoing demonstrates Bottini failed to show any probable success on its claim that it could have acquired Taylor's rights under the consulting services contract by assignment without Legacy's consent, there is no existing contractual obligation owed by Legacy to Bottini on which Bottini could premise a claim for breach of the implied covenant of good faith. (*Racine, supra,* 11 Cal.App.4th at p. 1032.)

*Conclusion*

Legacy met the threshold showing that the conduct on which Bottini's claims are based is conduct falling within the ambit of the anti-SLAPP statute, and Bottini did not present admissible evidence of facts that, if believed by the trier of fact, would support a judgment in its favor. We affirm the order striking Bottini's claims.

IV

ANALYSIS OF RULING ON ATTORNEY FEES AWARD

Bottini contends that, even assuming the motion to strike was properly granted, the trial court's award of attorney fees should be reversed because the trial court erred in calculating the lodestar amount with respect to the number of hours billed and the hourly rate charged.

29

A. <u>The Award</u>

Legacy submitted the declaration of attorney Maasch stating he had been retained specifically to bring the underlying anti-SLAPP motion and had expended approximately 59.6 hours at a billable hourly rate of $325, for a total amount of $19,730, and submitted invoices and a "pre-bill" worksheet (with some redactions) in support of the services he provided in connection with the anti-SLAPP motion. Legacy also submitted the declaration of attorney Hager averring he had spent a total of 19.4 hours at a billable hourly rate of $275, for a total amount of $5,335, and submitted an invoice (with some items eliminated as involving services unrelated to the anti-SLAPP motion) in support of the services he provided in connection with the anti-SLAPP motion.

In opposition to the motion, Bottini objected that one of the tasks listed by Maasch (the time spent drafting an association of counsel) was unrelated to the anti-SLAPP motion, and that the lack of detail as to the precise tasks Maasch performed warranted reduction of the award under *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315 (*Christian Research*). Bottini also objected that the number of hours billed was unreasonable because (1) the motion to strike was simple and straightforward and (2) many of the tasks "failed to contribute to the success" of the motion. Bottini also objected that Hager's time should be disallowed because Maasch was the only counsel necessary to the motion as an anti-SLAPP specialist, and many of the tasks performed by Hager were duplicative of tasks performed by Maasch, and therefore Hager's time should be disallowed as "padding" under *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132

30

(*Ketchum*). Finally, Bottini objected that there was no showing the hourly rates charged by Maasch and Hager were reasonable.

The court found the hourly rates charged by Maasch and Hager were reasonable, and reduced the award by eliminating one item (the time spent by Maasch drafting the association of counsel) and reducing the request by 10 percent to account for the overlapping time spent by both attorneys. Accordingly, the court awarded $23,112 as reasonable attorney fees.

B. Legal Framework

The anti-SLAPP statute provides for an award of attorney fees and costs to the prevailing defendant on a special motion to strike. (§ 425.16, subd. (c).) The defendant may recover fees and costs only for the motion to strike, not the entire litigation. (*S. B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 381; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1383.) The defendant may claim fees and costs either as part of the anti-SLAPP motion itself or by filing a subsequent motion or cost memorandum. (*American Humane Assn. v. Los Angeles Times Communications* (2001) 92 Cal.App.4th 1095, 1097.)

Because the Legislature specified the prevailing defendant "shall be entitled to recover his or her attorney's fees and costs" (§ 425.16, subd. (c)), an award is usually mandatory (see *Ketchum, supra,* 24 Cal.4th at p. 1131), although the amount of the award is vested in the sound discretion of the trial court. (*Id*. at p. 1132.) As the moving party, the prevailing defendant seeking fees and costs " 'bear[s] the burden of establishing

31

entitlement to an award and documenting the appropriate hours expended and hourly rates.' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020.)  The evidence should allow the court to consider whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended.  (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375.) "The law is clear . . . that an award of attorney fees may be based on counsel's declarations, without production of detailed time records."  (*Ibid.*; see *G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 620.)

A trial court "assessing attorney fees begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' " (*Ketchum, supra,* 24 Cal.4th at pp. 1131-1132.)  The court tabulates the attorney fee lodestar by multiplying the number of hours reasonably expended by the reasonable hourly rate prevailing in the community for similar work, although the court has discretion to increase or decrease that lodestar amount depending on a variety of factors. (*Id.* at p. 1134.)  Trial judges are entrusted with this discretionary determination because they are in the best position to assess the value of the professional services rendered in their courts.  (*Id.* at p. 1132; accord, *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096.)

We review an anti-SLAPP attorney fee award under the deferential abuse of discretion standard.  *(Ketchum, supra,* 24 Cal.4th at p. 1130.)  The trial court's fee determination " ' "will not be disturbed unless the appellate court is convinced that it is

clearly wrong." ' " (*Id*. at p. 1132.) An attorney fee dispute is not exempt from generally applicable appellate principles: "The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive." (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561-562.) We may not reweigh on appeal a trial court's assessment of an attorney's declaration (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622-623) and it is for the trial court "to assess credibility and resolve any conflicts in the evidence. Its findings . . . are entitled to great weight. Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict. This is true whether the trial court's ruling is based on oral testimony or declarations." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479, fn. omitted.)

C. Analysis

Bottini's first complaint—that the trial court's award was an abuse of discretion because there was no evidence the hourly rates charged by Hager and Maasch were reasonable—is meritless. Trial judges are entrusted with this determination because they are in the best position to assess the value of the professional services rendered in their courts. (*Ketchum, supra,* 24 Cal.4th at p. 1132; accord, *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at pp. 1095-1096.) Moreover, both Hager and Maasch averred the hourly rates they charged were commensurate with the rates charged by attorneys of

33

similar experience within the community. There was ample basis for the trial court to find the hourly rates charged by Maasch and Hager were reasonable.

Bottini also argues the amount of the fee award was an abuse of discretion because Legacy supported its fee request with a declaration from its attorney specifying the total amount of time spent by each counsel with bills that only summarized the types of tasks undertaken during those hours.[9] Bottini contends, under *Christian Research, supra,* 165 Cal.App.4th 1315, the trial court could make no award without itemized billing records and statements identifying each specific task performed in connection with the anti-SLAPP motion.

However, an analogous argument was rejected in *Raining Data Corp. v. Barrenechea, supra,* 175 Cal.App.4th 1363. In rejecting the challenge by Barrenechea to the attorney fees awarded to Raining Data following its successful anti-SLAPP motion, the court explained:

> "Barrenechea contends Raining Data failed to meet its initial burden to establish the reasonableness of the fees incurred because it did not submit its attorneys' billing statements. Barrenechea claims the declarations from Raining Data's attorneys 'do not provide any basis

_____

[9]    Bottini also argues that, because this was a "relatively easy and straightforward" anti-SLAPP motion, a large award is improper. However, Bottini's opening and reply briefs on appeal total nearly 90 pages on the merits alone, thereby belying Bottini's characterization this was a "relatively easy and straightforward" anti-SLAPP motion. Bottini also suggests that some of the work performed by Legacy's attorneys, including evidentiary objections that were later overruled and preparation of a supplemental declaration to which many objections were later sustained, should have been disallowed because it was unsuccessful. Bottini cites no authority that an attorney fee award may only be premised on those discrete tasks that produced some benefit to the overall ruling, and we decline to adopt that approach here.

34

for determining how much time was spent by any one attorney on any particular claims. Rather, the declarations give broad descriptions to the work provided by each attorney. The declarations are devoid of any information to allow the trial court to determine whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended.' The law is clear, however, that an award of attorney fees may be based on counsel's declarations, *without production of detailed time records.* [Citations.] *Raining Data's attorneys provided declarations detailing their experience and expertise supporting their billing rates, and explained the work provided to Raining Data.*" (*Id.* at p. 1375, italics added.)

Similarly, in *G.R. v. Intelligator, supra,* 185 Cal.App.4th 606, the party whose claim was stricken challenged the attorney fees award contending, in part, that "the attorney declaration filed in support of the request for fees and costs was insufficiently detailed for the court to determine whether the time spent and work performed were reasonable and whether part of the time might actually have been spent [on matters unrelated to the anti-SLAPP motion]." (*Id.* at p. 620.) The court, rejecting this challenge, explained "the trial court chose to accept the declaration of Intelligator's attorney as sufficient proof of the attorney's hourly rate, the time spent, and the reasonableness of the time spent. 'We may not reweigh on appeal a trial court's assessment of an attorney's declaration[,] [citation]' [(quoting *Christian Research, supra,* 165 Cal.App.4th at p. 1323)] and we see no abuse of discretion under the circumstances of this case in the court's decision not to require Intelligator's attorney to supply time records in support of her declaration." (*Ibid.*)

Bottini's reliance on *Christian Research, supra,* 165 Cal.App.4th 1315 provides no assistance. In that case, the appellate court (although noting a trial court *may* require the

35

movant to produce additional records and may reduce compensation on account of any failure to maintain appropriate time records) specifically affirmed that the trial court's discretion in calculating a fee award is broad (*id.* at p. 1321) and an appellate court "may not reweigh on appeal a trial court's assessment of an attorney's declaration [in support of the fee award]." (*Id.* at p. 1323.) The court's statement of what a trial court *may* require is not the equivalent of a holding that a trial court *must* seek additional documentation before making a fee award. The trial court here was satisfied with the detail provided by the attorneys' declarations and, paraphrasing the *G.R. v. Intelligator* court, "we see no abuse of discretion under the circumstances of this case in the court's decision not to require [Legacy's] attorney to supply time records in support of [the attorney's] declaration." (*G.R. v. Intelligator, supra,* 185 Cal.App.4th at p. 620.)

We conclude Bottini has not demonstrated the award was a clear abuse of the trial court's discretion, and we therefore affirm the award of attorney fees.

DISPOSITION

The judgment is affirmed. Defendants are entitled to costs on appeal.


McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.


36